COMMODORE LEASING, INC. *vs.* METROPOLITAN DISTRICT COMMISSION.

Suffolk. June 3, 1983. — June 28, 1983.

Present: ARMSTRONG, GREANEY, & DREBEN, JJ.

*Bailment,* Motor vehicle, Parking lot.

In an action seeking recovery for damage to an automobile stolen from the defendant's parking lot, evidence that the plaintiff paid the parking attendant a flat fee, parked his automobile in the lot, locked it and took the keys with him, and that, although the lot was fenced in and had only one exit, the attendant exercised no control over the departure of vehicles from the parking lot required a finding that the defendant was not liable for damages resulting from the theft of the automobile. [267-270]

CIVIL ACTION commenced in the Superior Court on December 28, 1977.

The case was heard by *Connolly,* J.

The case was submitted on briefs.

*Francis X. Bellotti,* Attorney General, *& Francis G. Chase,* Assistant Attorney General, for the defendant.

*Charles J. Wilkins* for the plaintiff.

GREANEY, J. The defendant, Metropolitan District Commission (MDC), appeals from a judgment for the plaintiff in the amount of $2,576.88, entered in the Superior Court after a trial before a judge sitting without a jury. The pivotal issue before the trial court was whether the plaintiff's automobile was the subject of a bailment when it was stolen from an MDC parking lot. The judge ruled that a bailment had been created and imposed liability on the MDC as bailee. We reverse.

The following facts (taken from the judge's findings and evidence before him) are not in dispute. On the morning of

October 9, 1975, Alan DiPietro, the son of the plaintiff's lessee, drove the automobile in question to an MDC parking lot located next to the Wonderland M.B.T.A. station in Revere. As he entered, he paid a fifty-cent fee to an attendant and was handed a ticket. He had no conversation with the attendant and proceeded to park the automobile in a space of his choice. DiPietro locked the car and retained the keys. He did not read the inscription on the ticket which declared it to be "a license for use of Commission property for parking and . . . not a contract for bailment," and purported to disclaim responsibility for theft or other loss. The lot was enclosed by a chain link fence and contained a single opening providing both ingress and egress. That passage was attended by an MDC employee from 5:00 A.M. to 1:00 P.M. on a regular basis, and was thereafter left unmanned. While on duty, the attendant exercised no control over departing vehicles. DiPietro had never used the lot before and was unaware of the staffing pattern. He returned to the unattended lot at approximately 5:00 P.M. and discovered that the vehicle had been stolen. It was subsequently recovered by the police, damaged to the extent of $2,576.88. Neither party apparently sought that a view be taken.

1. "A bailment, by definition, arises only upon delivery of possession of the property sought to be bailed, and at least some degree of control over that property, to the putative bailee." *Sewall* v. *Fitz-Inn Auto Parks, Inc.*, 3 Mass. App. Ct. 380, 382 (1975). See also 9 Williston, Contracts § 1065, at 1012 (3d ed. 1967) ("[I]t is generally held that to be a bailee, the parking lot operator or his agent should have an independent and temporarily exclusive possession of the automobile with some degree of control over it"). The dispositive question is whether the MDC had, or gave the appearance of having, "some degree of control" over the vehicles parked in its lot. We conclude on the facts, as matter of law, that it did neither.

The trial judge based his ruling that the control element of a bailment existed on "[t]he physical layout of the park-

ing lot, providing as it did but one entrance and exit," and determined that "[a] person of ordinary intelligence in the position of the driver of the plaintiff's car might properly assume from the requirement of a fee and the delivery of possession and control of the car to the owner of the parking lot that the owner assumed responsibility for its care."[1] While the physical layout of the lot unquestionably provided the opportunity for control, there was no showing of any exercise of the control made possible by the physical conditions. Neither do we think that a reasonable person in the driver's position, as posited by the trial judge,[2] could have believed either that he was delivering control of his vehicle or that the lot operator was assuming responsibility for it in the circumstances perceivable by him. It is much more likely that such a person would conclude that the entry transaction represented the extent of the management's involvement in the physical operation of its parking lot. The ticket which was issued was not of a type which could in some manner be connected with a particular automobile, later allowing an attendant to determine that its bearer was the authorized operator. It was not designed to describe the vehicle and it had no stub counterpart to be left with the car for later comparison. These factors have been considered especially significant by courts which have dealt with the

---

[1] The judge correctly ignored the limitation of liability contained on the ticket. General Laws c. 231, § 85M, inserted by St. 1972, c. 165, provides: "In any action of contract or tort in which the defendant is the owner or operator of a privately or publicly owned or operated garage, lot, or other facility used for the parking or storage of motor vehicles for a fee, it shall not constitute a defense that said owner or operator, by means of language appearing on any sign, ticket, or receipt, sought to disclaim, limit or exclude his legal liability. Any such disclaimer, limitation or exclusion of liability shall be void as against public policy."

[2] The reasonable person standard is, of course, the proper one to be applied in these cases, the results of which cannot be made to turn on the subjective belief of the motorist in question. In applying the standard, however, the relevant factors would include the number of times the plaintiff motorist had used the facility and what should have been observable to a reasonable person of like experience. See *Sewall* v. *Fitz-Inn Auto Parks, Inc.*, 3 Mass. App. Ct. at 382.

question. See *Ex parte Mobile Light & R.R.*, 211 Ala. 525 (1924) (suggesting that use of multiple-part tickets might imply control necessary for a bailment); *Southeastern Fair Assn.* v. *Ford*, 64 Ga. App. 871 (1941) (finding no bailment to exist where ticket could not be keyed to a particular automobile). In summary, although the ticket bears what appears to be a serial number, there is no evidence that the ticket was specifically identified with this transaction, rather it appears that it was like any other ticket issued to any other car on that or any other day. The ticket's purpose thus appears to have been only to give notice of the MDC's interpretation of the relationship created ("license") and to attempt (see note 1, *supra*) to disclaim liability for any loss. Although DiPietro did not examine the ticket, it should have been apparent to him from the transaction on entering that tickets were not needed to retrieve and remove vehicles from the lot, since the total parking charge had been paid at entry, the attendant had neither affixed a stub to the car nor made any identifying notation of the vehicle description, and drivers were permitted to retain their keys. All of this should have been manifest even to a first-time patron. In these circumstances, a reasonable person could not have believed that any control over the eventual departure of parked vehicles would be exercised by the MDC, despite the lot's limited access and fence.

In situations where, as here, vehicle keys are not surrendered by the driver, contrast *Doherty* v. *Ernst*, 284 Mass. 341, 342-344 (1933); *Sandler* v. *Commonwealth Station Co.*, 307 Mass. 470, 471 (1940), this conclusion is of critical importance, since the presence of real, purported, or apparent control over the egress of vehicles, as "by an attendant responsible for stopping and checking each car leaving the facility," is the decisive factor. *Sewall* v. *Fitz-Inn Auto Parks, Inc.*, 3 Mass. App. Ct. at 383 (citing *Hale* v. *Massachusetts Parking Authy.*, 358 Mass. 470 [1970]; *American Auto Sales, Inc.* v. *Massachusetts Port Authy.*, 2 Mass. App. Ct. 805 [1974]; and *Richard* v. *Massachusetts Port Authy.*, 2 Mass. App. Ct. 826 [1974], as cases decided

under this rationale). As in *Sewall,* it should have been evident to patrons like DiPietro that no such supervision would be provided and that "any control exercised by the defendant over his car, and any correlative responsibility assumed with respect thereto, came to an end once he had paid the fee and parked the car." *Id.* at 384. The same conclusion has been reached on virtually identical facts in *Porter* v. *Los Angeles Turf Club, Inc.,* 40 Cal. App. 2d Supp. 840 (1940). See also cases reviewed in Annot., 13 A.L.R.4th 362, 405-413 (1982) (the annotation collecting and categorizing the diverse cases on the subject).

2. In light of our disposition of the case on the bailment question, and because the issue was not raised in the Superior Court, see *Trustees of Stigmatine Fathers, Inc.* v. *Secretary of Admn. & Fin.,* 369 Mass. 562, 565 (1976), we do not reach the question whether the plaintiff, as owner of a leased automobile, may maintain an action based on a contract of bailment to which it was not a party. See generally *Fairfield's Motors, Inc.* v. *Fitz-Inn Auto Park, Inc.,* 1 Mass. App. Ct. 833, 834 (1973); *American Auto Sales, Inc.* v. *Massachusetts Port Authy., supra.*

The judgment for the plaintiff is reversed, and a new judgment is to enter for the defendant.

*So ordered.*